IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs September 1, 2020

## IN RE CORTEZ P.

**Appeal from the Juvenile Court for Hamblen County**
**No. J17086   Janice Hope Snider, Judge**

_____

### No. E2020-00219-COA-R3-PT

_____

This is a termination of parental rights case.  The trial court concluded that three grounds supported the termination of the father's rights and also concluded that termination was in the child's best interest.  Although we reverse one ground for termination found by the trial court, we affirm the trial court as to the remaining grounds.  Further, we conclude that the record supports the trial court's holding that termination of the father's parental rights is in the child's best interest

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed in Part; Reversed in Part and Remanded**

ARNOLD B. GOLDIN, J., delivered the opinion of the court, in which JOHN W. MCCLARTY, J., joined.  W. NEAL MCBRAYER, J., concurring in results only.

Gerald T. Edison, Rogerville, Tennessee, for the appellant, Lamar J.

Herbert H. Slattery, III, Attorney General and Reporter; Kathryn Baker, Senior Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

### OPINION

### BACKGROUND AND PROCEDURAL HISTORY

*Preliminary considerations*

Lamar J. ("Father") is the father of Cortez P. ("the child"), the child who is the primary subject of this appeal.[1]  The parental rights of the child's mother are not at issue, as the record indicates that she has surrendered her parental rights.  In addition to Father,

_____

[1] This Court has a policy of protecting children's identities in parental termination cases. Therefore, where appropriate, certain surnames appearing herein will be presented by use of initials.

the trial court proceedings also involved the termination of parental rights of another individual, James B., the father of another child of the mother.  Although James B. is not a central focus of our Opinion herein, we briefly examine the status of this case as to him in the interest of justice.

From the appellate briefing submitted by the Department of Children's Services ("the Department"), it is in essence suggested that termination proceedings were finally concluded as to James B. and that, because he has not appealed, his rights are not at issue. Implicit in such a conclusion is the notion that the trial court's termination order was final as to James B.  Although there is no question that the trial court's termination order terminates the parental rights of James B. pursuant to its terms, nevertheless the order cannot be considered final as to him because it is not compliant with Rule 58 of the Tennessee Rules of Civil Procedure.  *See Morel v. Nochera*, No. M2019-00347-COA-R3-JV, 2020 WL 1899608, at *4 (Tenn. Ct. App. Apr. 17, 2020) ("[I]f a judgment is not compliant with Rule 58, it does not represent a final judgment[.]").  That rule provides that an order of final disposition is "effective" when one of the following is marked on the judgment:

(1) the signatures of the judge and all parties or counsel, or

(2) the signatures of the judge and one party or counsel with a certificate of counsel that a copy of the proposed order has been served on all other parties or counsel, or

(3) the signature of the judge and a certificate of the clerk that a copy has been served on all other parties or counsel.

Tenn. R. Civ. P. 58.  Here, James B. is not listed on the clerk's certificate of service that is included on the order, nor did he or any counsel representing him affix a signature to the order.

As we have previously explained, the significance of Rule 58 lies in the notice it provides:

"The purpose of [Tenn. R. Civ. P. 58] is to insure that a party is aware of the existence of a final, appealable judgment in a lawsuit in which he [or she] is involved." *Masters ex rel. Masters v. Rishton,* 863 S.W.2d 702, 705 (Tenn.Ct.App.1992); *see also* Tenn. R. Civ. P. 58, advisory comm'n cmt. (stating that Rule 58 "is designed to make uniform across the State the procedure for the entry of judgment and to make certain the effective date of the judgment"). Compliance with Rule 58 is mandatory, *State ex rel. Taylor v. Taylor,* No. W2004-02589-COA-R3-JV, 2006 WL 618291, at *2 (Tenn. Ct. App. Mar.13, 2006) (quoting *Gordon v. Gordon,* No. 03A01-9702-CV-00054, 1997 WL 304114, at *1 (Tenn. Ct. App. June 5, 1997)),

and "[t]he failure to adhere to the requirements set forth in Rule 58 prevents a court's order or judgment from becoming effective." *Blackburn v. Blackburn,* 270 S.W.3d 42, 49 (Tenn. 2008) (citing *DeLong v. Vanderbilt Univ.,* 186 S.W.3d 506, 509 (Tenn. Ct. App. 2005)). This means that an order that does not comply with Rule 58 "is not a final judgment and is ineffective as the basis for any action for which a final judgment is a condition precedent." *Citizens Bank of Blount County v. Myers,* No. 03A01-9111-CH-422, 1992 WL 60883, at *3 (Tenn. Ct. App. Mar. 30, 1992) (holding that an execution and garnishment was improper when based on a judgment that did not comply with Rule 58); *see also State ex rel. Taylor,* No. W2004-02589-COA-R3-JV, 2006 WL 618291, *3 (Tenn. Ct. App. March 13, 2006)(dismissing the appeal for lack of a final order when the order appealed from did not comply with Rule 58).

*Steppach v. Thomas*, No. W2008-02549-COA-R3-CV, 2009 WL 3832724, at *4 (Tenn. Ct. App. Nov. 17, 2009).

The order in this case is simply not final as to James B. As a technical procedural matter, he may yet appeal upon the entry of a judgment that is compliant with Rule 58 as to him. Our observation about this matter should not be construed as expressing any opinion regarding the propriety of the termination of his parental rights. We merely intend to apprise those involved in this litigation that the record evidences a lack of a final judgment as to James B. As such, any action taken that presupposes the existence of a final judgment as to him would be improper at this time.

The identified concerns as to James B. notwithstanding, we are of the opinion that we can proceed to substantively address the termination of Father's parental rights regarding Cortez P. Indeed, there are no finality concerns as to Father even when considering the lack of finality attached to James B. We are able to reach this conclusion given the trial court's certification of its order concerning Father as final pursuant to Rule 54.02, where the court held that there was "no reason . . . for delay in the entry of a Final Judgment against the Respondent parent." We thus proceed to address those issues that are properly before us at this time and restrict our discussion accordingly.

*Background concerning Father and the child at issue*

The Department initially became involved in this matter in September 2017, less than a week after the child's birth. At the time of the child's removal, Father was incarcerated due to a probation violation, his probation having itself stemmed from a prior aggravated animal cruelty charge to which he had pleaded guilty.

In its petition for temporary legal custody filed with the Hamblen County Juvenile Court ("the trial court"), the Department outlined its concern over the drug usage of the

- 3 -

child's mother and alleged that it had a history with this family, specifically noting that there was significant domestic violence in the relationship between the child's mother and Father. The Department asserted that it had received a referral that the mother had abused drugs while pregnant with the child, and it averred that a case manager who had drug screened the mother reported her having tested positive for amphetamine and methamphetamine. The Department also sought the issuance of an immediate protective custody order, and as to Father, the Department's petition detailed that he was then incarcerated based on his probation violation. The underlying animal cruelty charge, it noted, had been incurred because Father had "placed kittens in a hot oven, killing them."

The trial court subsequently entered a protective custody order and placed the child in the Department's custody, and later, due to his incarceration and inability to serve as a resource for the child, Father stipulated that there was clear and convincing evidence that the child was dependent and neglected. Father was ordered to immediately begin payment of $10.00 per month in temporary child support.

In the wake of the child's removal, permanency plans were created. The first permanency plan, dated September 21, 2017, included the following responsibilities for Father: (1) follow all recommendations from the Tennessee Early Intervention Services; (2) ensure the child attends a dental cleaning and exam at age one and every six months thereafter; (3) complete anger management classes and provide proof of completion to the Department, the guardian ad litem, and the court; (4) learn how to utilize ETHRA and Tenncare transportation to ensure that the child attends all medical and dental appointments; (5) complete a parenting assessment to determine areas of weakness, follow any recommendations, and provide class certificates to the Department, guardian ad litem, and the court; (6) provide proof of reliable transportation such as a valid driver's license, car insurance, and vehicle registration; (7) schedule, attend, participate in, and complete a psychological evaluation and follow all recommendations and provide a copy of the assessment to the Department, guardian ad litem, and the court; (8) show stable housing by providing the Department, guardian ad litem, and the court with monthly rent receipts and paid utilities receipts; (9) provide names to possible relative/kin placement options so that the Department can engage the identified persons; (10) attend the child's medical and dental appointments; (11) submit to random drug screens; (12) schedule, attend, participate in, and complete an alcohol and drug assessment and follow all recommendations and provide a copy of the assessment to the Department, guardian ad litem, and the court; (13) resolve all legal issues and refrain from incurring any new charges; (14) provide a copy of the court order/petition to any provider completing any assessments; (15) visit the child at least 2 times per month; (16) complete offenders domestic violence classes and provide copies and proof of completion to the Department, guardian ad litem, and the court; (17) obtain and maintain employment and show a stable income by showing benefits received through DHS or by providing the Department, guardian ad litem, and the court with monthly paycheck stubs; (18) contact the child support enforcement agency to set up child support payments; (19) comply with a request

for DNA testing; and (20) take steps to legitimate the child. These responsibilities were designed to ensure the child's needs would be met and to ensure that Father would be able to provide a safe and stable home environment. A second permanency plan was created in March 2018, which, subject to certain minor exceptions, contained the same responsibilities for Father.

The present litigation was commenced when the Department filed a petition to terminate Father's parental rights on January 24, 2019. The petition averred that several grounds of termination were applicable to Father, including the definition of abandonment under Tennessee Code Annotated section 36-1-102(1)(A)(i) by dint of his alleged failure to visit the child in the four months preceding the petition's filing. The Department's petition further asserted that terminating Father's parental rights was in the child's best interest.

At the subsequent trial of this matter, the proof covered several areas, ranging from specific evidence of Father's continued legal troubles to testimony about his noncompliance with several of the permanency plan requirements. In order to assist with our review and give context to our discussion appearing later in this Opinion, we will attempt to briefly summarize the testimony of the witnesses who were called by the Department at trial.

The first witness to testify was Father. Father was incarcerated at the time of the first day of trial, and the proof revealed that his legal troubles had manifested throughout much of the child's young life. Indeed, Father acknowledged that he had been in jail at the child's birth, as well as at the time of the child's removal, due to a violation of his probation. He stated that he had been on probation at that time as a result of the aggravated animal cruelty charge against him. Whereas Father testified that he believed he had been released from jail in the fall of 2017, he later returned to jail on several occasions due to, among other reasons, "[c]asual exchange, simple possession" of marijuana. Father stated that he believed he had been incarcerated in June 2018 and acknowledged that he had been incarcerated again during July and August 2018. Although he was *not* incarcerated for most of the fall in 2018, he returned to jail again in December 2018.

Father testified that he had never seen the child, although he appeared to place some blame for this on a no-contact order that he understood to have been taken out against him. Father testified that he understood his submission to a mental health evaluation and drug and alcohol assessment as an important step that would allow him to be able to see his child. Father testified that he had completed a mental health evaluation and an alcohol and drug assessment in early 2019, and yet, when he was asked if he had attempted to have the no-contact order[2] lifted after completing those, Father replied that

---

[2] Following multiple references to the "no-contact" order during the course of trial, the trial court

he had not, noting he had been incarcerated since early December 2018. As of the first day of trial, which took place in June 2019, Father claimed that he would probably be released in July of that year, although he stated that he had to take care of a hold from the Hamblen County Jail.

As for periods of time when he had been out of jail, Father testified that he had lived with his sister, as well as with his mother. He claimed that both living arrangements had been pursuant to verbal agreements. Moreover, despite his incarceration as of the first day of trial, Father asserted that he had housing available at his mother's home upon his anticipated release. When specifically asked about the availability of housing through his mother, Father acknowledged it had "been a few months" since he had talked to his mother about this option. As for employment, Father testified that he had obtained work during periods when he was out of jail and received paychecks, and he further claimed to have employment available to him at Axcess Staffing in Knoxville whenever he was released.

Regarding the permanency plan requirements specifically, Father testified that he had received a copy of the permanency plan and that a Department representative had reviewed it with him. He also stated that he believed this Department representative had reviewed the Criteria for Termination of Parental Rights with him. Whereas testimony from a Department representative indicated that Father had not completed the psychological evaluation that was required, proof was also lacking as to the discussed mental health assessment Father claimed he had completed in early 2019. On the first day of trial, Father did not have copies of his mental health assessment. He further stated that he had not provided the Department or court certificates of completion of its recommendations.

Following Father's testimony, the Department called Sabrina Heck, a case manager who had been involved with this matter since September 1, 2017. Ms. Heck testified that she had attempted to maintain regular contact with Father, initially meeting with him in September of 2017 to go over the permanency plan and termination criteria. She also claimed to have met with Father in October 2017 while he was in jail. Ms. Heck's testimony indicated that on many occasions when she reached out to Father she did not get responses. She testified that she had spoken to him "intermittently" on the phone when he was not incarcerated "and through Facebook, and through text messages." Ms. Heck further recalled that she had spoken with Father when he was in a rehabilitation program at Buffalo Valley[3] but that she had lost contact with him for a short time. Ms. Heck testified that it had not been easy to get into contact with Father when he was out of

clarified to the parties its understanding that there was not a "no-contact" order per se. Rather, in expressing criticism for the use of this terminology, the court noted that it had previously reserved the issue of visitation for Father, pending his application to the court.

[3] Buffalo Valley is "an inpatient drug treatment facility." *In re T.L.R.*, No. M2002-01101-COA-R3-JV, 2003 WL 724434, at *1 (Tenn. Ct. App. Mar. 4, 2003).

jail.

Concerning the permanency plan requirements, Ms. Heck testified, among other things, that (1) Father had not completed anger management or provided proof of completion of same, (2) that she had not seen any proof of his completion of a parenting assessment, (3) that Father had never provided a transportation plan, (4) that Father had never submitted to a psychological evaluation, (5) that Father had not given any information regarding his housing during periods when he was out of jail, (6) that Father had not attended the child's medical and dental appointments, (7) that Father had never provided proof of completion regarding the required alcohol and drug assessment, (8) that she knew of four times Father had been in jail for violating his probation, (9) that Father had not visited with the child, (10) that Father had never provided proof of completion of offenders domestic violence classes, and (11) that Father had never provided pay stubs or any kind of proof of employment.

Ms. Heck testified that the child had been in a pre-adoptive foster home for twenty-one months and that he had a good bond with the foster parents. According to her testimony, the foster parents wanted to adopt the child. The child, she testified, had only ever known the foster parents as "mom and dad."

Jacqulyn B., the foster mother, testified following Ms. Heck. She stated that the child calls her and her husband "[m]ommy and daddy" and that the child seemed well-adjusted. She expressed a desire to adopt the child.

Upon the conclusion of the first day of trial, the trial court indicated that it would allow Father an opportunity to get proof pertaining to his alleged completion of a mental health assessment. A second trial date was subsequently convened, but Father still did not have the alleged records at that time. Father's counsel requested a continuance, representing that he would be able to obtain proof regarding a provider Father claimed he had seen and an alleged prescription that had been written for Father. The trial court was receptive to counsel's request for additional time to collect proof on Father's behalf, stating that it wanted to be "fair to everybody" and allow "everybody . . . an opportunity to present whatever you . . . think is important because [the case] has serious consequences." Ultimately, no such proof was ever presented to the court. The record indicates that despite the fact that a third trial hearing date was scheduled, Father did not appear on that date, and no further proceedings were held.

An order terminating Father's parental rights was entered by the trial court on January 9, 2020. Therein, the trial court held that three grounds for termination had been established against Father: (1) abandonment by failure to visit, Tenn. Code Ann. § 36-1-102(1)(A)(i); (2) substantial noncompliance with permanency plan requirements, Tenn. Code Ann. § 36-1-113(g)(2); and (3) failure to manifest an ability to parent, Tenn. Code Ann. § 36-1-113(g)(14). The trial court also concluded that termination of Father's

parental rights was in the child's best interests. This appeal followed.

## STANDARD OF REVIEW

"A biological parent's right to the care and custody of his or her child is among the oldest of the judicially recognized liberty interests protected by the due process clauses of the federal and state constitutions." *In re M.L.P.*, 228 S.W.3d 139, 142 (Tenn. Ct. App. 2007). "Although this right is fundamental and superior to claims of other persons and the government, it is not absolute." *In re J.C.D.*, 254 S.W.3d 432, 437 (Tenn. Ct. App. 2007). "It continues without interruption only as long as a parent has not relinquished it, abandoned it, or engaged in conduct requiring its limitation or termination." *In re M.J.B.*, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004). In this State, "[w]ell-defined circumstances exist under which a parent's rights may be terminated." *In re Roger T.*, No. W2014-02184-COA-R3-PT, 2015 WL 1897696, at *6 (Tenn. Ct. App. Apr. 27, 2015). Pursuant to the Tennessee Code, parties who have standing to seek the termination of a parent's parental rights must prove two things. They must first prove at least one of the statutory grounds for termination. *In re J.C.D.*, 254 S.W.3d at 438 (citing Tenn. Code Ann. § 36-1-113(c)(1)). Then, they must prove that termination of parental rights is in the child's best interests. *Id.* (citing Tenn. Code Ann. § 36-1-113(c)(2)).

Because the decision to terminate parental rights has "profound consequences," trial courts must apply a higher standard of proof in deciding termination cases. *In re M.L.P.*, 228 S.W.3d at 143. "To terminate parental rights, a court must determine that clear and convincing evidence proves not only that statutory grounds exist but also that termination is in the child's best interest." *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002) (citing Tenn. Code Ann. § 36-1-113(c)). "Clear and convincing evidence is evidence that eliminates any substantial doubt and that produces in the fact-finder's mind a firm conviction as to the truth." *In re M.A.B.*, No. W2007-00453-COA-R3-PT, 2007 WL 2353158, at *2 (Tenn. Ct. App. Aug. 20, 2007). This heightened burden of proof "minimizes the risk of erroneous decisions." *In re M.L.P.*, 228 S.W.3d at 143.

Due to the heightened burden of proof required in termination cases, we must adapt our customary standard of review. *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005). "First, we must review the trial court's specific findings of fact de novo in accordance with Tenn. R. App. P. 13(d)." *In re M.J.B.*, 140 S.W.3d at 654. "Second, we must determine whether the facts, either as found by the trial court or as supported by the preponderance of the evidence, clearly and convincingly establish the elements required to terminate a biological parent's parental rights." *Id.*

## DISCUSSION

In his appellate brief, Father raises only a single issue for our consideration: whether the trial court erred in finding that it was in the child's best interest to terminate

his parental rights. Despite the fact that Father has not directly mounted a challenge to the trial court's findings pertaining to the grounds supporting a termination of his parental rights, our appellate review must go beyond the narrow concern he delineates in his brief. In order to help "ensure that fundamental parental rights are not terminated except upon sufficient proof, proper findings, and fundamentally fair procedures," the Tennessee Supreme Court has mandated that we review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interest. *See In re Carrington H.*, 483 S.W.3d 507, 525-26 (Tenn. 2016) ("[I]n an appeal from an order terminating parental rights the Court of Appeals must review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests, regardless of whether the parent challenges these findings on appeal."). We thus proceed herein to carry out this responsibility.

*Abandonment*

We turn first to the trial court's conclusion that Father abandoned the child. Abandonment is a statutory ground for termination under Tennessee Code Annotated section 36-1-113(g)(1). As that authority alludes to, however, Tennessee Code Annotated section 36-1-102 in turn contains several alternative definitions of the conduct that actually constitutes abandonment. *See* Tenn. Code Ann. § 36-1-113(g)(1) (providing that termination may be based on "[a]bandonment by the parent or guardian, as defined in § 36-1-102"). As noted earlier in this Opinion, the trial court specifically found that Father had "abandoned his minor child within the meaning of T.C.A. §36-1-102(1)(A)(i)." This definition of abandonment provides for termination of a parent's parental rights when:

> For a period of four (4) consecutive months immediately preceding the filing of a proceeding, pleading, petition, or any amended petition to terminate the parental rights of the parent or parents or the guardian or guardians of the child who is the subject of the petition for termination of parental rights or adoption, that the parent or parents or the guardian or guardians either have failed to visit or have failed to support or have failed to make reasonable payments toward the support of the child[.]

Tenn. Code Ann. § 36-1-102(1)(A)(i).

In its brief, the Department argues that this Court should uphold the trial court's conclusion regarding abandonment in a general sense, but notably, it suggests that another statutory definition of abandonment, one pertaining to incarcerated or recently incarcerated parents, is applicable. Namely, despite the fact that its petition sought termination on the statutory provision of abandonment that the trial court held was established, the Department maintains that this was not the ground actually tried. Rather, it contends that the parties, by consent, tried the ground for abandonment codified at

Tennessee Code Annotated section 36-1-102(1)(A)(iv). Moreover, notwithstanding the trial court's reference to section 36-1-102(1)(A)(i) in its final order, the Department asserts that the ground at Tennessee Code Annotated section 36-1-102(1)(A)(iv) was found. The alleged "incorrect statutory cite" by the trial court, it argues, is nothing more than a scrivener's error.

Assuming *arguendo* that the trial court's reference to section 36-1-102(1)(A)(i) was merely a scrivener's error, the question becomes whether the record here would permit a conclusion that the other definition of abandonment codified at section 36-1-102(1)(A)(iv) was tried by consent. As this Court has explained in a previous decision, in order to make such a finding, "it must be clear from the record that the evidence presented relevant to the unpled ground had no relevance to any other issue being presented to the Trial Court." *In re Eimile A.M.*, No. E2013-00742-COA-R3-PT, 2013 WL 6844096, at *5 (Tenn. Ct. App. Dec. 26, 2013). Moreover, it must be "clear from the record that the parent fully understood that this particular unpled ground for termination was being tried and that the parent impliedly consented to the trial of that ground even though it had not been pled." *Id.* We cannot reach the conclusion that such a standard has been sufficiently satisfied here. As to this latter concern pertaining to a parent's awareness, it is true that the parties stipulated as to a particular period of time when Father had not been incarcerated. As a precise technical matter, however, it is not clear to us from this record that Father understood any such stipulation as relevant to a trial on section 36-1-102(1)(A)(iv). Rather, it appears that he understood it to be relevant to a trial about section 36-1-102(1)(A)(i), the ground found by the trial court. Comments by Father's counsel at the trial hearing reflect that he understood the original "look back period" would be from September 24, 2018-January 24, 2019, a time frame the relevance of which would generally correspond to section 36-1-102(1)(A)(i) given the filing of the Department's petition to terminate on January 24, 2019. *See* Tenn. Code Ann. § 36-1-102(1)(A)(i) (looking to a period of four consecutive months immediately preceding the filing of the petition). However, because of certain periods of incarceration within the four-month period, Father's counsel in essence argued that the specific period calculated was not strictly limited to the four months immediately preceding the petition's filing.

Although this Court has previously held "that the definition of abandonment found in subsection (i) is inapplicable where the parent has been incarcerated during all or part of the four months preceding the filing of the termination petition," *In re London B.,* No. M2019-00714-COA-R3-PT, 2020 WL 1867364, at *7 (Tenn. Ct. App. Apr. 14, 2020), the comments by Father's counsel at trial do not evidence a clear understanding that, because of such law, section 36-1-102(1)(A)(iv) was the ground properly being tried given his incarceration within the four months prior to the filing of the petition. As we construe his comments, they simply reflect his understanding as to how the period under section 36-1-102(1)(A)(i) should allegedly be calculated.

From our review of its order, the trial court appeared to incorporate the

understanding of Father's counsel as valid, deferring to the parties' stipulation as to the "relevant look-back period" supposedly applicable under the ground. Its order does not contain a holding that an alternative statutory ground was tried by consent, and we are of the opinion that there is no scrivener's error. The trial court did not just casually cite to section 36-1-102(1)(A)(i) instead of section 36-1-102(1)(A)(iv). Rather, it also specifically quoted the controlling language in section 36-1-102(1)(A)(i). This is in accord with the apparent understanding[4] of Father at trial that the parties were proceeding under section 36-1-102(1)(A)(i), the definitional ground that was pled, albeit subject to a slightly revised calculation of the period allegedly pertinent to that section.

We express no opinion herein on whether this record, if we were to examine it for this purpose, would properly establish the ground codified at section 36-1-102(1)(A)(iv). For the reasons stated above, we simply reject the Department's contention that section 36-1-102(1)(A)(iv) was the ground that was tried. The comments by Father's counsel at trial do not clearly express this understanding, nor does the trial court's order reflect such an occurrence. Under these circumstances, we refuse to countenance the Department's position that we affirm a supposed holding that was not explicitly made, i.e., that Father abandoned the child pursuant to section 36-1-102(1)(A)(iv).[5]

As it is, the trial court clearly held that Father abandoned the child under section 36-1-102(1)(A)(i). As to this finding, we reverse the trial court for two reasons. One, as evident from the discussion herein, the Department has distanced itself from any reliance on this ground, arguing that it attempted to try an alternative definition of abandonment. Two (and likely the reason the Department has disclaimed reliance on the ground), this Court has held that section 36-1-102(1)(A)(i) does not apply when the parent was incarcerated during part of the four months preceding the filing of the petition to terminate, as Father was here. *See In re Douglas H.*, No. M2016-02400-COA-R3-PT, 2017 WL 4349449, at *6 (Tenn. Ct. App. Sept. 29, 2017).

*Substantial Noncompliance with the Permanency Plan Requirements*

Pursuant to Tennessee Code Annotated section 36-1-113(g)(2), a court may terminate parental rights when a parent is in "substantial noncompliance . . . with the statement of responsibilities in a permanency plan." Tenn. Code Ann. § 36-1-113(g)(2).

---

[4] We do not intend to suggest that the trial transcript is not somewhat ambiguous regarding this subject in places. But it is the ambiguity of the matter that compels our conclusion herein, especially in light of the fact that termination grounds are connected to specific statutory provisions within the Tennessee Code. Indeed, a *clear* understanding by Father as to the fact that section 36-1-102(1)(A)(iv) was supposedly being tried is absent. Had this point been fully understood by everyone involved, it stands to reason that the trial court would have made specific note of it and made a finding that another ground for termination had actually been tried by consent.

[5] We observe that section 36-1-102(1)(A)(iv) was recently amended by the General Assembly. *See* 2020 Tenn. Pub. Acts, ch. 525.

In conjunction with terminating a parent's parental rights under this ground, the court "must first find that the plan requirements are reasonable and related to conditions that necessitate foster care placement." *In re Hannah H.*, No. E2013-01211-COA-R3-PT, 2014 WL 2587397, at *10 (Tenn. Ct. App. June 10, 2014). "The trial court must then find that the noncompliance is substantial." *Id.* Although the termination statute does not define what conduct constitutes substantial noncompliance, terminating parental rights under this ground "requires more proof than that a parent has not complied with every jot and tittle of the permanency plan." *In re M.J.B.*, 140 S.W.3d at 656. The significance of the noncompliance "should be measured by both the degree of noncompliance and the weight assigned to that requirement." *In re Valentine*, 79 S.W.3d at 548. "Terms which are not reasonable and related are irrelevant, and substantial noncompliance with such terms is irrelevant." *Id.* at 548-49. Because determining whether substantial noncompliance exists is a question of law, we review the issue de novo with no presumption of correctness. *Id.* at 548.

Here, the trial court determined that the permanency plan requirements were "overall, reasonable and related to remedying the conditions which necessitate foster care placement." We agree with the trial court that the permanency plan requirements in this case were reasonable, and like the trial court, we conclude that this ground for termination was clearly and convincingly established notwithstanding the fact that Father took some minor steps toward compliance in this case. As we recounted in our previous summary of her trial testimony, Ms. Heck detailed multiple areas of noncompliance on Father's part. Significantly, in our view, Father never completed the required psychological evaluation, and moreover, he failed to comply with multiple responsibilities aimed at ensuring that he could provide a safe and stable home environment for the child. For example, among other things, the proof showed that Father had not given the Department any information regarding his housing during periods when he was out of jail, that he had never provided pay stubs or any kind of proof of employment, and that he returned to jail on multiple occasions throughout the pendency of the case notwithstanding the requirement that he resolve legal issues, refrain from incurring new charges, and follow all probation regulations. The trial court's reliance on this ground for termination is hereby affirmed.

*Failure to Manifest an Ability to Parent*

The last ground for termination relied upon by the trial court is codified at Tennessee Code Annotated section 36-1-113(g)(14). That statute provides that a parent's rights may be terminated when he or she

> has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological

- 12 -

welfare of the child.

Tenn. Code Ann. § 36-1-113(g)(14). This ground for termination is a relatively new addition to the Tennessee Code and requires the Department to establish two elements by clear and convincing proof. *In re Maya R.*, No. E2017-01634-COA-R3-PT, 2018 WL 1629930, at *7 (Tenn. Ct. App. Apr. 4, 2018). First, the Department must "prove that [the parent] failed to manifest 'an ability and willingness to personally assume legal and physical custody or financial responsibility of the child[ren].'" *Id.* (quoting Tenn. Code Ann. § 36-1-113(g)(14)). Second, the Department "must . . . prove that placing the children in [the parent's] 'legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[ren].'" *Id.* (quoting Tenn. Code Ann. § 36-1-113(g)(14)).

Although different panels of this Court have expressed differing opinions as to the proper construction of this ground, we are of the opinion that the first prong of this ground

> requires that the petitioner prove that a parent has failed to meet the requirement of manifesting both a willingness and an ability to assume legal and physical custody of the child or has failed to meet the requirement of manifesting both a willingness and an ability to assume financial responsibility of the child.

*In re Amynn K.*, No. E2017-01866-COA-R3-PT, 2018 WL 3058280, at *14 (Tenn. Ct. App. June 20, 2018). Therefore, consistent with the discussion in the *In re Amynn K.* decision, we do not view a parent's demonstration of "willingness" as fatal to this ground when accompanied by a failure to manifest the requisite "ability." *But see In re Ayden S.*, No. M2017-01185-COA-R3-PT, 2018 WL 2447044, at *7 (Tenn. Ct. App. May 31, 2018) ("The proof at trial negated a required element of the statutory ground. The juvenile court found: 'In this case, these parents definitely want to assume legal and physical custody of the children and are willing to assume financial responsibility for the children.'").[6]

In concluding that this ground for termination was established by the proof presented at trial, the trial court made the following detailed findings:

> [The child] was born to [his mother] [in August 2017]. No father

---

[6] We observe that the Tennessee Supreme Court has recently granted permission for an appeal regarding this ground for termination. *See In re Neveah M.*, No. M2019-00313-COA-R3-PT, 2020 WL 1042502 (Tenn. Ct. App. Mar. 4, 2020), *perm. app. granted*, No. M2019-00313-SC-R11-PT (Tenn. June 15, 2020).

was listed on the child's birth certificate, but [Father] was later identified as the father of [the child]. [Father] subsequently underwent DNA testing that conclusively established his paternity of [the child]. The court records do not contain anything indicating that [Father] pursued the legal establishment of his paternity.

[The child] was removed into state custody on September 1, 201[7],[7] due to his mother's drug abuse during her pregnancy. [Father] was incarcerated at the time of the child's birth and removal into custody. He has been in and out of jail since.

Due to this putative father's incarceration following his conviction[] of . . . aggravated animal cruelty . . ., on September 27, 2017, the Court reserved his visitation rights[.] . . . Questions also remained about [Father's] mental health due to the horrific circumstances of his animal cruelty, in which he cooked . . . kittens in an oven prior to finally beating them to death.

During the periods of time [Father] was not incarcerated, he did not take reasonable steps to legally resolve the restrictions on his visitation with [the child]. He has never seen or visited his son. [Father] did pay $100 in support, but it was paid as an attachment bond to secure his release from jail, and not from a sincere desire to provide for the well-being of his child.

[Father] voiced an attempt to establish a home with his mother and spoke of employment. Even so, the progress begun by him was only a step in the right direction.

This father did engage in successful mental health treatment, but could not provide any information to the Court that would give reassurance he would not return to his past violent behavior. While he has made commendable progress in some respects, [Father] has not demonstrated that he can provide a safe and stable environment for [the child]. Given his history and violence, drug abuse and serious mental health issues, the strong indication remains that [Father] could pose a risk of substantial harm to the physical or psychological welfare of this child if [the child] were returned to him without further treatment and progress.

The facts of this case support a finding that all elements of T.C.A. §36-1-113(g)(14) have been proven by clear and convincing evidence; that

_____

[7] Although the trial court listed the year as 2019 here, this appears to be an inadvertent typographical error. As evidenced by the record and at a previous place within the trial court's own order, removal took place on September 1, 2017.

this father has failed to manifest an ability to parent since this child was removed into state custody; and, that placing [the child] in his father's custody would pose a risk of substantial physical or psychological harm to this child.

Having reviewed the record transmitted to us, we agree with the trial court's conclusion that this ground was properly established. Father was in and out of jail, and although he claimed to have housing and employment during episodes when he was not incarcerated, he failed to provide the Department with information about his housing or proof of his employment. Based on a consideration of all the facts in this case, including Father's failure to ever submit to a psychological evaluation, we conclude not only that Father failed to manifest an ability to assume custody of the child (a child he has never visited), but also that placing the child in his care would pose a risk of substantial harm to the child.

*Best Interests*

When at least one ground for termination has been properly established against a parent, as is the case here, we turn our focus to whether termination is in the child's best interests. "Because not all parental conduct is irredeemable, Tennessee's termination of parental rights statutes recognize the possibility that terminating an unfit parent's parental rights is not always in the child's best interest." *In re Jacobe M.J.*, 434 S.W.3d 565, 573 (Tenn. Ct. App. 2013). As such, "[w]hen at least one ground for termination of parental rights has been established, the petitioner must then prove, by clear and convincing evidence, that termination of the parent's rights is in the child's best interest." *Id.* at 572.

When courts conduct a best interests analysis, they must resolve conflicts between the interests of the parent and child in "favor of the rights and best interest of the child." *Id.* at 573 (citing Tenn. Code Ann. § 36-1-101(d)). Indeed, the best interests analysis "must be viewed from the child's, rather than the parent's, perspective." *White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004). In Tennessee, the General Assembly has codified a list of nine non-exclusive factors that trial courts are to consider when conducting a best interests inquiry in termination of parental rights proceedings. These factors are as follows:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

- 15 -

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i). "Ascertaining a child's best interests does not call for a rote examination" of these factors, and "depending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis." *In re Audrey S.*, 182 S.W.3d at 878.

As noted earlier, the trial court's best interests findings are the only aspect of this case that Father has actually challenged on appeal. Although his appellate presentation is rather sparse on the subject, it is readily apparent that his principal objection relates to the alleged insufficiency of the trial court's findings. He complains in his brief, for example, that the trial court "did not examine each of the nine [statutory best interest] factors." Contrary to Father's contention, the trial court's findings do not present any impediment to the termination of his parental rights. Rather, the findings, as is appropriate, clearly support termination in this instance.

Although it is certainly advisable that a court make a specific finding regarding each statutory factor, such is not absolutely required. *In re Addalyne S.*, 556 S.W.3d 774, 793 (Tenn. Ct. App. 2018) ("Although the trial court in this case did not analyze each of the nine factors enumerated in the statute, the trial court did specifically mention the existence of the nine factors when determining the best interest of the child."); *In re Adoption of K.B.H.*, 206 S.W.3d 80, 85 (Tenn. Ct. App. 2006) ("There is no requirement that the trial court make a written finding on each of the enumerated Section 36–1–113(i) factors."). What remains of utmost importance is that the court consider the statutory factors and, if termination is ordered in connection therewith, that the evidence clearly and convincingly support the court's best interests conclusion.

Here, the trial court's order clearly supports the conclusion that the court considered the statutory best interests factors. The order specifically references Tennessee Code Annotated section 36-1-113(i) as setting out the factors that should guide the court's best interests analysis, and immediately upon noting that it was "[c]onsidering the enumerated factors," the trial court offered multiple findings responsive to them. Among other specific findings pointing to a lack of demonstrated stability on the part of Father, the court held that Father had not made an adjustment of his circumstances and conduct that would make it safe for the child to be in his custody, noted that the child had no acquaintance with Father, found that the child's foster parents provide a loving and stable home, and held that placement of the child with Father would likely be detrimental to the child's safety and well-being.

Based on our review of this record, we do not disturb the trial court's judgment. The evidence clearly and convincingly supports the conclusion that termination of Father's parental rights is in the child's best interests. As we have explained, the best interests inquiry necessarily must be viewed from the child's perspective. When viewed from that perspective, termination is clearly justified in this case. Father has failed to demonstrate any prolonged stability in his life, and as the court observed in its final order, he "fell off the radar" and failed to even appear at the last scheduled court date. "Often, the lack of a meaningful relationship between a parent and child is the most important factor in determining a child's best interest." *In re London B.*, 2020 WL 1867364, at *12. Here, *Father has never visited the child*. The child, in contrast, knows the foster parents as his "mommy and daddy," who provide a loving and stable home for the child and wish to adopt him. In light of all of the circumstances discussed above and the proof contained in the record, we conclude that termination of Father's parental rights should be affirmed, the termination clearly being in the child's best interests.

## CONCLUSION

For the reasons stated herein, we reverse the trial court's reliance on Tennessee Code Annotated section 36-1-102(1)(A)(i) as a ground for termination in this case. As the record nonetheless contains clear and convincing evidence supporting the remaining

grounds for termination, as well as the trial court's best interests holding, the termination of Father's parental rights is hereby affirmed.

_____
ARNOLD B. GOLDIN, JUDGE